**In re Tommy F. and Carolyn B. ROBINSON, Debtors.**

**No. 2:05–bk–13915M.**

United States Bankruptcy Court, E.D. Arkansas, Eastern Division.

Aug. 29, 2007.

Sheila F. Campbell, Sheila Campbell, P.A., Little Rock, AR, for Debtors.

Frederick S. Wetzel, Frederick S. Wetzel, P.A., Little Rock, AR, pro se.

### ORDER

JAMES G. MIXON, Bankruptcy Judge.

Before the Court are two motions for sanctions filed by Wildlife Farms II, LLC; Bill Thompson; and Boyd Rothwell ("Movants"). The Movants seek monetary sanctions pursuant to Federal Rule of Bankruptcy Procedure 9011 against attorneys Sheila Campbell and Roy C. Lewellen, who represent Tommy and Carolyn Robinson ("Debtors").

The first Motion for Sanctions was prompted by three papers signed by both Campbell and Lewellen. The second Motion for Sanctions has been brought solely against Campbell for allegations in a Counterclaim she prepared in response to an Objection to Discharge lawsuit brought by the Movants against the Debtors. That lawsuit, numbered 2:06–ap–0111, was tried before the Court on January 10, 2007, and resulted in the Debtors being denied a discharge.

Campbell and Lewellen filed written responses and testified at a hearing on the pending motions on April 20, 2007, in Little Rock, Arkansas. At the conclusion of the hearing, the Court indicated its intention with regard to the sanctions to be imposed upon Lewellen and Campbell. However, after exhaustive review of the testimony and exhibits and research of the applicable law, the Court will instead impose the sanctions set out herein.

The motions are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A) (2006), and the Court may enter a final order in this case.

### FACTS

To place the offending papers in their proper context, it is necessary to review the relevant events occurring both before and after the Robinsons were adjudicated Chapter 7 debtors under the United States Bankruptcy Code by order entered on the Court's docket on October 5, 2005. The source of much of this background information is this Court's Order of Contempt

entered on April 17, 2007. (Pls.' Ex. 2.) That order found the Debtor Tommy Robinson in Criminal Contempt of Court.

In 2002, Wildlife Farms II, LLC ("Wildlife Farms") was formed. The entity subsequently purchased rural land in Monroe County, Arkansas for the purpose of building and operating an upscale hunting lodge as a commercial venture. Wildlife Farms initially borrowed approximately three million dollars to accomplish the purchase and construction.

Thompson, Rothwell, the Robinsons, and other individuals owned interests in Wildlife Farms through their various corporate entities. Ag–Pro Farms of Arkansas, Inc. ("Ag–Pro Farms"), a corporation owned entirely by Carolyn and Tommy Robinson, held title to the Robinsons' one-third interest in the venture. Additionally, Robinson, through one of his corporate entities, leased the land or some portion of it for his farming operation.

Wildlife Farms' venture proved to be unprofitable, and quarreling and litigation among the owners ensued in November 2002 in the Circuit Court of Monroe County, Arkansas ("Circuit Court"). During the course of the litigation, the Circuit Court terminated Robinson's farming lease of the Wildlife Farms property on March 1, 2003, for failure to pay rent, but other issues remained to be resolved. (Pl.'s Ex. 1, Cred.'s Ex. 21.) [1]

On August 9, 2004, while the Circuit Court litigation was still pending, Wildlife Farms negotiated an option contract with the United States that would allow the United States to impose a wildlife easement on the Wildlife Farms real property in consideration of a substantial sum of money. The option could only be exercised by the United States, and it subsequently expired without being exercised. The existence of the option was not disclosed to the Circuit Court or to the Robinsons.

### AG–PRO FARMS BANKRUPTCY

On September 3, 2004, before the final judgment in the Wildlife Farms litigation was entered, the Robinsons' corporation, Ag–Pro Farms, filed a Chapter 11 bankruptcy petition and was assigned case number 2:04–bk–20447. The case was subsequently converted to Chapter 7 on October 27, 2004.

In November 2004, the Circuit Court issued a letter opinion finding that Ag–Pro Farms, by then a Chapter 7 debtor in bankruptcy, was in default on a note owed to Wildlife Farms. (Pls.' Ex. 1, Cred.'s Ex. 21.) Subsequently, the Bankruptcy Court signed a consent order on December 13, 2004, that granted relief from the automatic stay and abandonment of Ag–Pro Farms' one-third interest in Wildlife Farms. (Pls.' Ex. 1, Cred.'s Ex. 20.)

The relief from stay permitted the Circuit Court to enter a final judgment allowing the completion of the foreclosure of Ag–Pro Farm's interest in Wildlife Farms. That interest was sold to Wildlife Farms on January 27, 2005, for $233,774.26. (Ex. C–1, Commissioner's Bill of Sale.) Lewellen was one of the attorneys for Ag–Pro Farms during the litigation surrounding

---

**1.** Plaintiffs' Exhibit 1 is a transcript of a hearing before the Bankruptcy Court at which 23 Creditors' exhibits were introduced. Both the transcript and the Creditors' exhibits were admitted into evidence in this proceeding as Plaintiffs' Exhibit 1. The record before the Court also includes transcripts of two other hearings resolving matters in the Robinsons' bankruptcies and a related bankruptcy. See Exhibit L–1 and Exhibit C–3. Additionally, Exhibit L–2 consists of a transcript and exhibits from a hearing before the Circuit Court of Monroe County.

the foreclosure, but did not represent Ag–Pro Farms in the bankruptcy proceeding.

## ROBINSON INVOLUNTARY BANKRUPTCIES

On March 25, 2005, some two months after Ag–Pro Farms' interest was sold and while the Ag–Pro Farms bankruptcy was still open, the Movants filed involuntary petitions for relief under the provisions of Chapter 7 of the Bankruptcy Code against the Robinsons.

The Robinsons contested the involuntary petitions, and a hearing ("Involuntary Hearing") was held before this Court on September 28, 2005. On October 5, 2005, an order was entered adjudicating the Robinsons to be Chapter 7 debtors. (L–2, Def.'s Ex. 10, Order.) (Testimony at the Involuntary Hearing by the various parties would subsequently play a part in the motion for sanctions filed solely against Campbell and will be discussed in more detail below under the heading "Second Motion for Sanctions Against Campbell".) The Movants each filed proofs of claim in the two bankruptcies. The proofs of claim totaled $179,588.60 in Tommy Robinson's bankruptcy and $140,442.67 in Carolyn Robinson's bankruptcy. (Pls.' Ex. 8.)

## AMENDED EASEMENT OPTION

On May 17, 2005, several months after Ag–Pro Farms' interest in Wildlife Farms had been foreclosed and sold, a new option for a wildlife easement was negotiated between Wildlife Farms and the United States. The option was exercised on August 9, 2005, and Wildlife Farms received the net sum of $1,635,074.00. No portion of the proceeds from the sale of the easement was distributed to any of the individual partners of Wildlife Farms, except as reimbursement for monies the individuals had lent to cover operating expenses of Wildlife Farms. Generally, the proceeds were paid toward indebtedness to Wildlife Farms' secured creditors.

Thereafter, in March or April of 2006, Debtor Tommy Robinson and Campbell, his bankruptcy attorney, met with the Trustee in the Debtors' cases to inform the Trustee of the approximately $1.6 million paid to Wildlife Farms for the wildlife easement. They inquired as to whether the Trustee might have a cause of action against Thompson, Rothwell, Wildlife Farms, and others for failing to disclose the existence of the option to the Circuit Court during the foreclosure proceedings.

## TRUSTEE'S SETTLEMENT

After an investigation into the matters brought to his attention, the Trustee settled on behalf of the Debtors' estates with Thompson, Rothwell, and Wildlife Farms as to all issues that were or could have been raised by the Trustee, including the issue related to the failure to disclose the wildlife easement option. (Ex. L–2, Def.'s Ex. 7, Trustee's Motion for Compromise Settlement.)

After a hearing on the proposed global settlement, the Court approved the settlement over the Debtors' objection that, among other things, the Robinsons' bankruptcy estates were entitled to one-third of the wildlife easement proceeds. (Ex. L–2, Def.'s Ex. 8, Objection to Trustee's Motion for Compromise Settlement.) The order approving the settlement stated that the Debtors lacked standing to object to the settlement. (Ex. 1, Cred.'s 4, Order) That order was not appealed. Thereafter, pursuant to the settlement, the Trustee dismissed various appeals and pending lawsuits previously filed by the Robinsons and executed releases as Trustee for the Debtors' estates. (Ex. L–2, Def's Ex. 13, 14.)

## OBJECTION TO THE ROBINSONS' DISCHARGE

Meanwhile, the Movants had filed an objection to the Debtors' discharge in Ad-

versary Proceeding 06–1111 on March 23, 2006 ("Objection to Discharge"). On behalf of the Debtors, Campbell answered the complaint on April 14, 2006, adding a counterclaim ("Counterclaim") against the plaintiffs for fraud and alleging that the option to impose a wildlife easement had not been disclosed.[2] (Ex. L–2, Def.'s Ex. 2, Answer to Complaint and Counterclaim for Fraud.) On August 22, 2006, Campbell's Counterclaim to the Objection to discharge was dismissed with prejudice in an Agreed Order. (Pls.' Ex. 1, Cred.'s Ex. 6, Agreed Order.)

## STATE COURT CAUSE OF ACTION

After settling with the Trustee as to causes of action against them that were property of the Robinsons' bankruptcy estates, the partners owning Wildlife Farms arranged to sell the property by absolute auction. They expended $110,000.00 to nationally advertise the sale and otherwise market the property. The auction was scheduled to occur on the premises of Wildlife Farms on Tuesday, December 19, 2006, at 1:00 p.m.

On the Saturday before the sale, the Debtor Tommy Robinson conferred with Lewellen, who subsequently prepared a 16–page complaint naming the Ag–Pro Farms, the Debtors, and their sons as plaintiffs and Wildlife Farms, Rothwell, Thompson, and others as defendants. Filed in the Circuit Court of Monroe County on December 18, 2006, the Monday before the Tuesday auction, the complaint ("state court action") asked the Circuit Court to set aside its judgment of foreclosure of 2005 and award damages to the plaintiffs because the defendants had defrauded the plaintiffs by failing to disclose the existence of the option to impose a

wildlife easement. Lewellen also filed a notice of lis pendens with the recorder of deeds in Monroe County, Arkansas.

A hearing took place on December 19, 2006, in the Circuit Court ("TRO Hearing") on a motion for a temporary restraining order to stop the sale. At the hearing, Lewellen withdrew the request to stop the sale and asked the court to direct that the proceeds of the sale not be distributed until the merits of the state court action could be adjudicated. (Pls.' Ex. 1, Cred.'s Ex. 23.)

At the TRO hearing, the attorney for the defendants introduced documents showing that the cause of action before the Circuit Court had already been settled by the bankruptcy trustee in a settlement approved by order of the Bankruptcy Court. (Exhibit L–2, Def's Ex. 6, Trustee's Motion for Compromise Settlement; Def's Ex. 8, Objection to Trustee's Motion for Compromise Settlement; Def.'s Ex. 9, Order.) At the conclusion of the hearing, the Circuit Court recommended that the plaintiffs apply to the Bankruptcy Court for permission to proceed on the merits in the state court action.

## CANCELLATION OF THE AUCTION AND MOTION FOR CONTEMPT

Predictably, the auction was cancelled because the title insurance company would not issue a policy. (Pls.' Ex. 1, Cred.s' Ex. 19, stating that title insurance would not be issued unless the notice of lis pendens was properly released and the pending lawsuit was dismissed with prejudice). The pending lawsuit was not dismissed with prejudice until February 27, 2007, and the lis pendens notice was released by facsimile transmission on January 2, 2007

---

**2.** This Counterclaim is also related to the Second Motion for Sanctions filed exclusively against Campbell and will be discussed in detail below under the heading "Second Motion for Sanctions Against Campbell."

and recorded on January 5, 2007. (*See* Case No. 2:05–bk–13915, Docket Entry No. 268, Certified Copy of Monroe County Circuit Court Order dismissing complaint with prejudice and Docket Entry No. 269, Certified Copy of "Withdrawal of Lis Pendens".) Both actions came too late to permit the auction to proceed.

After the TRO hearing, the Movants filed a Motion for Contempt in bankruptcy court on December 21, 2006, against the Debtors and Lewellen, stating that the state court action directly violated a previous Order of this Court enjoining the Debtors and those acting at the Debtors' behest from interfering with the Trustee's administration of the bankruptcy estates.[3] In response to the Motion for Contempt, Campbell and Lewellen filed a document on January 16, 2007, styled "Response of Counsel for Debtor in State Court Action Who Has Sought Relief from Stay in This Proceeding Only for Limited Purposes" ("Contempt Response").

## MOTION FOR RELIEF FROM STAY AND BRIEF IN SUPPORT

Also after the Movants' Contempt Motion was filed, Campbell and Lewellen filed a Motion for Relief from Stay on January 9, 2007. The Motion attached a copy of the state court complaint, reiterated the allegations of fraud, and asked this Court to allow the state court action to proceed. Additionally, the Motion asked the Court to hold in abeyance all bankruptcy proceedings in the Debtors' cases until the Circuit Court entered its judgment on the pending complaint, arguing that if the Circuit Court vacated its prior judgment resulting in the Robinsons losing their interest in Wildlife Farms, the

Debtors' bankruptcy case should be dismissed for lack of subject matter jurisdiction. Campbell and Lewellen also submitted an accompanying Brief in Support of their Motion.

By order dated February 28, 2007, the Court denied the Motion for Relief from Stay after a hearing on the Motion conducted on February 26, 2007. (Pls.' Ex. 3.) At that same hearing, the Court found Lewellen and the Debtor Tommy Robinson to be in civil contempt of court in that the filing of the state court action interfered with the Trustee's administration of the Robinson bankruptcy cases in direct violation of the July 28, 2006 Court order. Lewellen and the Debtor Tommy Robinson were incarcerated until they purged themselves of contempt by filing with the Bankruptcy Court certified copies of an order dismissing the state court action with prejudice and a release of the Lis Pendens notice. These papers were filed with the Bankruptcy Court the day after the contempt hearing. Additionally, the Court held the Debtor Tommy Robinson in criminal contempt of court for the filing of the state court action in the Circuit Court. The Court's ruling was based on the finding that the Trustee in the cases had settled the state court cause of action that was later filed by Lewellen on behalf of the Robinsons. (Pls.' Ex. 2.)

## MOTION FOR SANCTIONS

Prompted by the Motion for Relief from Stay, Brief in Support, and Contempt Response, the Movants filed a motion for sanctions against Campbell and Lewellen ("First Sanctions Motion") on March 15, 2007. On April 4, 2007, the Movants filed a separate motion for sanctions ("Second

---

**3.** That Order enjoining the Debtors was entered July 28, 2006. The Order resulted from an assault on Thompson by the Debtor Tommy Robinson and his adult sons. (See Ex. 1, Tr. at 116, Court's review of the circumstances surrounding the issuance of the July 28, 2006 Order.)

Sanctions Motion") against Campbell regarding statements she made in open court at the Contempt Hearing on February 26, 2007, that related to the Counterclaim in the Objection to Discharge litigation. This motion will be discussed more fully under the heading "Second Sanctions Motion Against Campbell." The Second Sanctions Motion did not involve Lewellen's role in the representation of the Debtors.

Each motion will be addressed separately below.

## FIRST MOTION FOR SANCTIONS AGAINST CAMPBELL AND LEWELLEN

On January 30, 2007, in accordance with Federal Rule of Bankruptcy Procedure 9011(c)(1)(A), the Movants' counsel supplied Campbell and Lewellen with formal notice of his intention to file a motion for sanctions against them unless, within 21 days, they withdrew the Debtors' Motion for Relief from Stay, Brief in Support, and Contempt Response discussed above. (Pls.' Ex. 4, Ex. B.) Campbell and Lewellen failed to withdraw these pleadings, and the First Motion for Sanctions was filed on March 15, 2007.

In their motion, the Movants argue that the Motion for Relief from Stay and Brief in Support are frivolous. They state that the Motion for Relief from Stay and Brief seek Court authorization to pursue a cause of action that was previously settled by Court order approving the Trustee's global settlement and that was also the basis of the Counterclaim that Campbell dismissed with prejudice in an agreed Court order filed in the Objection to Discharge litigation.

They further argue that Campbell and Lewellen's Contempt Response, filed January 16, 2007, was knowingly false in that it stated the Debtor Tommy Robinson informed Lewellen that the sale of the wildlife easement had never been disclosed to him or reviewed by any court. The Movants point out that Campbell had knowledge of the easement when she objected to the Trustee's global settlement that was approved June 1, 2006, and when she filed the Counterclaim in the Objection to Discharge litigation on April 14, 2006. The Movants contend that these facts show that Campbell and Lewellen failed in their duty to make reasonable inquiry pursuant to Rule 9011(b).[4]

The Movants also contend that the offending pleadings were filed for the improper purposes of harassing the Movants and causing unnecessary delay and needless expense in violation of Rule 9011(b)(1).

## CAMPBELL'S RESPONSE TO FIRST SANCTIONS MOTION

In her response to the First Sanctions Motion, Campbell argues that the Bankruptcy Court lacked subject-matter jurisdiction to adjudicate a state law breach of contract action between the Debtors and

---

4. The Movants further contend that the Rule is violated because the Motion for Relief from Stay argues inconsistently that the res judicata doctrine does not apply to the state court action. The Movants state that the Court rejected Campbell's argument at a prior hearing on the Trustee's Settlement that res judicata did not apply to the Debtors' RICO cause of action, a lawsuit based on facts similar to the state court action. Despite the Court's rejection of this argument with regard to the RICO cause, she argued that the Motion for Relief from Stay should be granted because the state court action was not precluded by res judicata. But subsequent to the filing of the Motion for Relief from Stay, she argued at the Objection to Discharge hearing that res judicata *did* apply to the RICO cause of action. The record before the Court is insufficient to rule on whether this inconsistency is established.

their former partners, counterclaims in such an action, or the equitable cause of action for fraud filed by the Debtors. Further, she argues that the Counterclaim dismissed with prejudice was void *ab initio* because the Debtor lacked standing to bring the Counterclaim. Therefore, she reasons, the dismissal with prejudice was also void *ab initio*. She cites no authority for this proposition. Additionally, she states that any argument in support of the Debtors' position was made in good faith.

Campbell testified at the Sanctions hearing on April 20, 2007, that after the December 18, 2006 hearing in Monroe County Circuit Court, Lewellen asked for her assistance in filing a motion for relief from stay as directed by the Circuit Court. (April 20, 2007 Tr. at 157.) Campbell stated she and Lewellen worked together on the Motion for Relief from Stay. (April 20, 2007 Tr. at 176.) Initially, she reviewed Lewellen's legal research and concluded the Motion was proper and that res judicata and collateral estoppel did not apply to the cause of action.

Her research focused on state law cases dealing with Arkansas Rule of Civil Procedure 60(k), retroactive relief from the automatic stay, factors courts consider in granting motions for relief from stay, core proceeding jurisdiction, the Rooker–Feldman doctrine, and whether property of the estate included pre-bankruptcy, foreclosed property interests. (April 20, 2007 Tr. at 158–164, 167.)

Upon receiving the safe harbor letter from counsel, Campbell declined to withdraw the offending pleading because she believed the Motion for Relief from stay was proper and because she believed she was ethically bound to pursue the Motion since the Debtor Tommy Robinson objected to its withdrawal. (April 20, 2007 Tr. at 170, 175–77.) In testimony she speculated that the Bankruptcy Court lacked jurisdiction because if the Debtors had retained their one-third interest in Wildlife Farms, they would not have been adjudicated debtors because the plaintiffs in the involuntary proceeding would not have been creditors eligible to file the involuntary proceeding against the Debtors. (April 20, 2007 Tr. at 177–78.)

Upon examination by counsel, Campbell acknowledged knowing about the Trustee's settlement of all claims, especially a claim based on the same facts as her Counterclaim in the Objection to Discharge adversary proceeding. (April 20, 2007 Tr. at 171–72.) She admitted the Court had commented in a previous hearing that the Counterclaim she had filed was sanctionable, but that she had to be threatened with sanctions before she dismissed it. (April 20, 2007 Tr. at 172.)

Campbell also admitted that she objected to the Trustee's motion for settlement that was later approved by Court order and that her objection was based on the fraudulent concealment of the sale of the wildlife easement. (April 20, 2007 Tr. at 175.) She asserted that "the fact that the Trustee has settled that underlying action doesn't dissipate the fact that you can still go back and file the 60(k) motion." (Tr. at 175.) Conceding that she was confused, she testified that "I didn't really understand that the Trustee had settled the [state court action]." (April 20, 2007 Tr. at 180.)

## LEWELLEN' S RESPONSE TO FIRST SANCTIONS MOTION

In his response to the First Sanctions Motion, Lewellen stated that when he learned of his client's omission of relevant information, he sought to withdraw from the state court action but that Robinson refused to authorize such withdrawal but did authorize the withdrawal of the notice of lis pendens. (April 20, 2007 Tr. at 94–

95.) Lewellen further argued that he was also unable to unilaterally withdraw the Motion for Relief from Stay and Brief because Campbell was lead counsel, and he deferred to her knowledge of the course of litigation. (April 20, 2007 Tr. at 95–96.) He asserted that he asked for relief from stay because directed to do so by the Circuit Court. (April 20, 2007 Tr. at 88–89.)

In testimony before the Court, Lewellen stated that he believed he had a good faith basis to proceed with the state court action. He speculated that had the option been exercised and the money for the easement been paid before the Debtor Tommy Robinson lost his interest in Wildlife Farms, Robinson would have gained an equity cushion to borrow against and possibly stave off the foreclosure sale. (April 20, 2007 Tr. at 81–82.)

Lewellen's legal research prior to filing the state court action included "looking at" more than 500 cases to review state and federal procedural rules related to fraud and issues related to fiduciary duties in partnerships. (April 20, 2007 Tr. at 153.) He also claimed to have perused the Bankruptcy Code with regard to the effect of abandonment. (April 20, 2007 Tr. at 143–44.) He stated that he researched and wrote the 16–page complaint in two days' time. (April 20, 2007 Tr. at 145–48.) Although he knew Robinson was in bankruptcy, he did not consult the bankruptcy reporters for apposite cases, nor did he contact the Debtors' bankruptcy trustee or any bankruptcy lawyer for legal advice before filing the state court action.

As to his factual allegations in the state court action and the Motion for Relief from Stay, Lewellen relied on Robinson's statement that the property, presumably meaning Ag–Pro Farm's interest in Wildlife Farms, had been abandoned by the Bankruptcy Court. (April 20, 2007 Tr. at 82–83.) When questioned by the Bankruptcy Court at the hearing, Lewellen expressed the opinion that, in the Ag–Pro Farms bankruptcy, a consent order was entered granting relief from stay and abandonment of Ag–Pro Farms' one-third interest in Wildlife Farms. Therefore, he concluded, the alleged cause of action for fraud was also abandoned. He reasoned that because the cause of action was abandoned, it did not become property of the estate in the Robinsons' involuntary cases. (April 20, 2007 Tr. at 141–44.) He cites no authority for this proposition.

During the course of his testimony, Lewellen contradicted himself numerous times, a circumstance that reflects unfavorably on his credibility. These contradictions included the following statements:

(1) When Robinson refused to dismiss the state court action, Lewellen stated, "I made specifically sure that, one, I was withdrawn." (April 20, 2007 Tr. at 94.) He stated that he did not withdraw the offending Motion for Relief from Stay because Robinson was determined to pursue it. (April 20, 2007 Tr. at 94–95.) Later in his testimony, Lewellen admitted that he has never formally withdrawn from representation in the bankruptcy case and is still attorney of record in the state court action as to a pending counterclaim against two of the plaintiffs. (April 20, 2007 Tr. at 96–97, 101–104.)

(2) Lewellen reiterated a position he had previously expressed in another hearing when he testified, "I was not admitted to practice and didn't have the technical expertise to file stuff in Bankruptcy Court." (Tr. at 96.) He also testified, "I've never been in bankruptcy court in my life." (April 20, 2007 Tr. at 102.) Upon questioning, he conceded that he was admitted to practice in federal district court and that he had been an attorney of record and appeared before this Court on a bank-

ruptcy matter a number of years ago. (April 20, 2007 Tr. at 136–37.)

(3) Lewellen charged that the state court defendants (the Movants) had sabotaged their auction by informing the title insurance company of the litigation filed one day before the auction. (April 20, 2007 Tr. at 87, 129–30.) Several times in his testimony he stated that he was not to blame for the cancellation of the sale because he had withdrawn the notice of lis pendens and his objections to the sale in open court during the December 18, 2006 TRO hearing in Circuit Court. (April 20, 2007 Tr. at 87, 93–94, 97–98, 129–131.) Yet his statements regarding the withdrawal of the notice of lis pendens were false. He did not formally release the notice until January 2, 2007, long after the auction was cancelled for want of a title insurance policy. Furthermore, the release was transmitted to the clerk by facsimile, contrary to his testimony. (*See* Case No. 2:05–bk–13915, Docket Entry No. 269, Certified Copy of "Withdrawal of Lis Pendens".)

### SUMMARY

In considering the allegations in the First Motion for Sanctions and Campbell and Lewellen's responses and defenses to the Motion, the Court reiterates the following facts and circumstances because they are particularly relevant to these proceedings:

1. In regard to the wildlife easement, Ag–Pro Farms' interest in Wildlife Farms had been foreclosed and sold before the Movants negotiated and received proceeds from the new option to impose a wildlife easement.

2. The circumstances of the alleged fraud committed by the Movants were re-vealed to the Robinsons' Trustee in bankruptcy, the Trustee settled that claim over the objection of the Debtors, and the Court approved the settlement in a final order that has not been appealed.

3. In her Counterclaim to the Objection to Discharge adversary proceeding, Campbell alleged the plaintiffs (Movants) committed fraud with regard to the wildlife easement option; she later dismissed that Counterclaim with Prejudice.

### DISCUSSION

The goal of Federal Rule of Bankruptcy Procedure 9011 is to deter the filing of baseless pleadings and papers in bankruptcy court. Toward that end, the Rule establishes the standards and procedures the bankruptcy court applies and follows in determining whether to sanction attorneys and litigants who have violated the Rule.

The portion of Rule 9011 relevant to these proceedings states the following:

(b) Representations to the Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [5]

---

5. Campbell and Lewellen do not contend that their legal arguments extend, modify, or re-verse existing law or establish new law.

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

Federal Rule of Bankruptcy Procedure 9011(b)(1)-(3).

■ Generally, an attorney making a reasonable inquiry under Rule 9011 must investigate "whether there is a factual and legal basis for a claim before filing." *Briggs v. Labarge (In re Phillips)*, 433 F.3d 1068, 1071 (8th Cir.2006). *See also In re Am. Telecom Corp.*, 319 B.R. 857, 867 (Bankr.N.D.Ill.2004) (emphasizing "the 'facts and law known or available' after a reasonable investigation at the time of the challenged document's signing and filing") (quoting *Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1572–73 (11th Cir.1995)).

■ The Rule outlines two grounds for the imposition of sanctions: (1) frivolousness resulting from an attorney's or party's failure to make a reasonable inquiry into the supporting facts and law prior to the filing of papers with the court, and (2) an attorney's or party's filing of papers with the court for an improper purpose, such as delay, harassment, or increasing litigation costs. *In re McNichols*, 258 B.R. 892, 901 (Bankr.N.D.Ill.2001) (citing *In re Kaliana*, 207 B.R. 597, 601 (Bankr.N.D.Ill. 1997)). The Movants' motion for sanctions against Lewellen and Campbell rests on both grounds: frivolousness and improper purpose.

## WHETHER THE OFFENDING PLEADINGS ARE FRIVOLOUS

■ In considering whether to award sanctions for a frivolous filing, a court must inquire whether a "reasonable and competent attorney would believe in the merits" of the filing. *Crofford v. Conseco Fin. Serv. Corp. (In re Crofford)*, 301 B.R. 880, 885 (8th Cir. BAP 2003) (citing *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir.2003)). *See also Smyth v. City of Oakland (In re Brooks–Hamilton)*, 329 B.R. 270, 283 (9th Cir. BAP 2005)(measuring the attorney's conduct " 'objectively against a reasonableness standard, which consists of a competent attorney admitted to practice before the involved court' ") (quoting *In re Grantham Bros.*, 922 F.2d 1438, 1441 (9th Cir. 1991)).

■ The inquiry involves first determining that the pleading is frivolous and then considering whether the person who signed the pleading should have been aware that the pleading is frivolous. *Cuthill v. Averett, Warmus, Durkee, Bauder & Thompson, P.A. (In re Evergreen Security Ltd.)*, 318 B.R. 220, 225 (Bankr. M.D.Fla.2004) (citing *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir.1998)).

■ A sanction for violation of Rule 9011 under the frivolousness clauses does not require a finding of bad faith or "nefarious intent." *In re Rivera*, 342 B.R. 435, 460 (Bankr.D.N.J.2006)(stating that "[t]he 'pure-heart-and-empty-head' defense is not available to anyone faced with Rule 9011 sanctions") (citing *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir.1987); William W. Schwarzer, *Sanctions Under the New Federal Rule 11–A Closer Look*, 104 F.R.D. 181, 187 (1985)). *See also In re Am. Telecom Corp.*, 319 B.R. at 857 (recognizing that courts apply an objective standard of reasonableness to legal theories and factual contentions challenged on the basis of Rule 9011 and good faith is not enough to "comply with the 'frivolousness' clauses")(citing *Insurance Ben. Administrators v. Martin*, 871 F.2d 1354, 1359 (7th Cir.1989); *Mars Steel Corp. v. Continental Bank.*, 880 F.2d 928, 932 (7th Cir.1989)).

### WHETHER THE LEGAL ARGUMENTS ARE FRIVOLOUS

██ One of the ways an attorney violates Rule 9011 is by posing a frivolous legal argument not warranted by existing law. An argument not warranted by existing law is based on legal theories that are "plainly foreclosed by well-established legal principles and authoritative precedent. . . ." *White v. Burdick (In re CK Liquidation Corp.)*, 321 B.R. 355, 362 (1st Cir. BAP 2005) (citing *In re Willis Furniture Co.*, 148 B.R. 691, 694 (Bankr.D.Mass. 1992); *Dibbs v. Gonsalves*, 921 F.Supp. 44, 47–49 (D.P.R.1996); *Aetna Casualty & Surety Co. v. Kellogg*, 856 F.Supp. 25, 32–33 (D.N.H.1994); 10 Collier on Bankruptcy 9011.04[7][a] (15th ed. rev.2004)). *See also In re Brooks–Hamilton*, 329 B.R. at 285, 289 (stating that the lack of legal support for the claims asserted should have been obvious to a competent attorney; the offending legal argument was not only implausible but ridiculous).

██ In discussing whether a legal argument is frivolous, the court in *In re American Telecom* pointed out that " 'the conclusion drawn from the research undertaken must itself be defensible. Extended research alone will not save a claim that is without legal or factual merit from the penalty of sanctions.' " *In re Am. Telecom*, 319 B.R. at 867–68 (quoting *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 n. 9 (9th Cir.1986), *overruled on other grounds, Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)).

██ Under these guidelines, the Court finds that the Motion for Relief from Stay and Brief in Support pose frivolous legal arguments that ignore the primary issues. The Motion, which seeks relief from stay so that the state court action can proceed, alleges that the defendants in the action committed fraud that resulted in a final judgment in the Monroe Country Circuit Court that should be set aside by that state court. The Motion states that the erroneous state court judgment was the basis for the Debtors' involuntary bankruptcies and that if that judgment were set aside, this Court should dismiss those bankruptcies for lack of subject matter jurisdiction because the persons who placed the Robinsons in involuntary bankruptcy would no longer be the Debtors' creditors.

This conclusion about jurisdiction ignores the fact that the Robinsons' debts to the three petitioning creditors in the involuntary proceeding included obligations other than the amount of the foreclosure judgment satisfied by the sale of Ag–Pro Farms' interest in Wildlife Farms. Nor does the Brief in support of the Motion cite any authority or apposite cases supporting this conclusion that an involuntary bankruptcy can be undone in this manner. The Brief futilely focuses on the question of whether the doctrine of res judicata would preclude the relief sought in the Circuit Court given that the Circuit Court is asked to vacate a previous final order. The central argument is that the alleged recently discovered fraud committed by the Defendants serves as a sufficient basis for the Circuit Court to set aside its first, erroneous judgment.

As authority, Lewellen and Campbell cite the Constitutions of Arkansas and the United States; Arkansas and Federal Rules of Civil Procedure; and case law from the Arkansas Supreme Court and Court of Appeals, the Eighth Circuit Court of Appeals, and the United States Supreme Court. Various respected legal treatises are also cited. These authorities purportedly support the concept that res judicata does not preclude an action to set aside a previous judgment if the second

action is based on allegations of fraud that corrupted the first judgment.

Accepting without deciding that these authorities support this proposition, the Court could not have granted relief from stay based solely on this argument because the cause of action had already been reviewed and disposed of by this Court's final order, as Campbell and Lewellen were well aware. At the time that the Relief from Stay Motion and Brief were filed, Campbell and Lewellen knew about the Trustee's previous settlement of the Debtors' cause of action against Rothwell, Thompson, and Wildlife Farms. Months earlier, Campbell herself had conferred with the Trustee about the failure to disclose the wildlife easement option and then later objected to the Trustee's proposed settlement of the Debtors' causes of action against the three. She knew that the Court approved the settlement in a final order that held that the Debtors were without standing to object to the Motion. Campbell did not appeal the order.

Additionally, in the separate Objection to Discharge litigation, Campbell had filed the Counterclaim alleging the same failure to disclose the easement option, a counterclaim she subsequently dismissed with prejudice. Campbell's argument that a dismissal with prejudice renders the dismissed claim null and void so that it can later be refiled is unsupported by legal authority and is an incorrect statement of the law.

As to Lewellen, he was made aware that the state law cause of action had previously been settled by the Trustee by virtue of the exhibits received into evidence at the December 19, 2008 TRO hearing in the Circuit Court.

Because Campbell and Lewellen were aware of the Court's final order approving the Trustee's compromise and because Campbell knew she had dismissed her fraud Counterclaim with prejudice, both attorneys should have known that the state court action was barred under principles of res judicata. Furthermore, a reasonable and competent attorney with knowledge of the applicable law would have recognized that the Debtors had no standing to bring this suit in state court when all the Debtors' causes of action, including state law claims, became property of the estate upon the filing of the petition. A reasonable and competent attorney would have to conclude that, as property of the estate, this cause of action became subject to administration by the Trustee and to the jurisdiction of the Bankruptcy Court.[6]

Even if not a regular practitioner in bankruptcy court, a reasonable and competent attorney recognizes basic concepts such as the necessity for proper standing in order to bring a lawsuit and the binding effect of a final order and the dismissal of a claim with prejudice. Lewellen's legal research, which he stated included the review of some 500 cases in a two-day period, erroneously focused on state law issues related to fraud, even though he was aware the Robinsons were debtors in bankruptcy, the circumstance that prompted the Relief from Stay Motion in the first place. Although Campbell, who is a bankruptcy practitioner, did research some bankruptcy issues, her review of case law failed to address the major impediment to the Motion for Relief from Stay: How

---

6. If Campbell and Lewellen had researched this issue, they would probably have discovered the apposite case of *In re Griffin*, 330 B.R. 737 (W.D.Ark.2005), *aff'd sub nom Beaty v. Griffin*, 205 Fed.Appx. 468 (8th Cir.2006).

That case affirmed this Court's sanctions against the debtor's attorney for asserting a claim that was property of the estate and could only be pursued by the trustee in the case.

could the Debtors proceed in state court on a cause of action that was property of the estate and had already been settled by the Trustee?

Not surprisingly, Campbell and Lewellen failed to support with established legal principles and precedent their speculation about how the Bankruptcy Court's jurisdiction might evaporate if the state court judgment were overturned. Nor have they offered precedent or any facts to bolster their assertion that the abandonment of Ag–Pro Farms' interest in Wildlife Farms meant the alleged cause of action for fraud allegedly held by the Robinsons was also abandoned and that once abandoned, the cause never became property of the Robinsons' bankruptcy estate but instead remained the Robinsons' property outside of bankruptcy.

In formulating their abandonment argument, Campbell and Lewellen refuse to recognize the very basic principle that the Debtors' interest in Wildlife Farms that was abandoned from the Ag–Pro Farms bankruptcy was an interest in real estate, not a cause of action to set aside the foreclosure sale. The cause of action for fraud is a different and separate property interest, a chose in action.

There is no evidence in this record that the cause of action, if any, for failing to disclose the existence of the wildlife easement was ever property of the estate of Ag–Pro Farms, and if it was, whether it was a scheduled asset. The Ag–Pro Farms case was closed before the easement was exercised and the money for the easement was paid to Wildlife Farms. If the asset, the cause of action for fraud, existed and was scheduled in the Ag–Pro Farms case and not administered by the Trustee it would have become property of Tommy and Carolyn Robinson and ultimately property of their estates upon the commencement of their involuntary bankruptcies. If the cause of action existed but was not scheduled in the Ag–Pro Farms case and was not administered by the Trustee, the cause of action remains property of the estate of Ag–Pro Farms and could only have been administered by the Trustee in the Ag–Pro Farms case. *U.S. ex rel Gebert v. Transport Admin. Serv.,* 260 F.3d 909, 913 (8th Cir.2001); *In re Benefield,* 102 B.R. 157, 158 (Bankr. E.D.Ark.1989.)

The complaint filed in the state court action alleged that the Debtors were defrauded when the first easement option was executed in 2004, a time prior to the filing of the Robinsons' involuntary bankruptcies. To the extent the chose in action existed in the bankruptcy estates of Tommy and Carolyn Robinson, it was administered by the Trustee of the Robinsons' bankruptcies for cash paid to the estate by the Movants pursuant to a settlement approved over the objection of the Debtors. The Court order approving the settlement was not appealed. The cause of action was never abandoned by the Trustee administering assets for the Robinsons' bankruptcy estates; therefore, it never became the post-petition property of Tommy and Carolyn Robinson. It is absurd to argue otherwise under the facts of this case.

That Campbell ever genuinely believed in the abandonment theory is questionable, given that she and the Debtor Tommy Robinson initially called upon the Trustee in the Debtors' cases to urge him to bring the suit for fraud. At the hearing on the settlement with the Movants, the Debtors never contested the Trustee's position that whatever cause of action existed belonged to the Trustee as representative of the Robinsons' estates.

Both attorneys defend their pleadings by pointing out that they conducted extensive legal research. However, even extensive research will not save an indefensible

claim. *In re Am. Telecom*, 319 B.R. at 867–68. Their legal research obviously uncovered no apposite bankruptcy case supporting their peculiar theories about bankruptcy jurisdiction and abandoned property of the estate, which should have been fair warning. Yet inexplicably they persisted in their unfounded claims. Moreover, the Court does not find Lewellen's testimony credible that he engaged in vast amounts of research before filing the state court action, especially given the time limitations.

Lewellen defends his filings on other grounds. He states that he does not practice bankruptcy law and at one point even asserted that he is not admitted to practice before this Court. He recanted this assertion after he was reminded that he had previously appeared before this Court in another bankruptcy case and that any lawyer admitted to practice in federal court is automatically admitted to practice in bankruptcy court.

▆▆▆ Apparently, Lewellen believes that if he can establish that he is sufficiently inept in bankruptcy matters, he will not be held responsible for filing a frivolous pleading with the Court. However, Lewellen is held to the objective standard of a reasonable and competent attorney with sufficient knowledge of the applicable law. The pure-heart-empty-head-defense is not available to him as to the issue of whether he violated the Rule. An attorney who signs and files pleadings with the certain knowledge that he is not versed in the applicable law does so at his own peril.

Lewellen and Campbell argue that they did not withdraw the pleadings during the safe harbor period because, among other reasons, their client would not acquiesce to withdrawal. This argument overlooks the fact that under the Arkansas Rules of Professional Conduct attorneys are allowed to withdraw from representation al-

together if "a client insists upon pursuing an objective that the lawyer considers repugnant or imprudent ... or ... other good cause for withdrawal exists." Arkansas Rule of Professional Conduct 1.16(b)(3).

Thus, if after being forewarned by the proposed sanctions motion, Lewellen and Campbell came to believe that their filings were not warranted by existing law, they could have, and should have, legitimately withdrawn from the case without their client's permission during the safe harbor period. Their argument that their client would not allow them to withdraw the offending pleadings is particularly disingenuous given that neither attorney has chosen to exercise the option of formal withdrawal from representation afforded by the Rules of Professional Conduct.

## WHETHER THE CONTEMPT RESPONSE IS FRIVOLOUS

The Movants argue that the Contempt Response is frivolous pursuant to Rule 9011 because it contains a knowingly false statement. The Movants specifically refer to the statement in the Response that the Debtor Tommy Robinson informed Lewellen on December 16, 2006, that the negotiations and sale of the wildlife easement had never been disclosed to him or reviewed by any court.

▆▆▆ Rule 9011 is violated on frivolous grounds if the filing is factually groundless or demonstrates "a 'deliberate indifference to obvious facts' ..." *In re Evergreen Security Ltd.*, 318 B.R. 220, 225–26 (Bankr.M.D.Fla.2004) (citing *Davis v. Carl*, 906 F.2d 533, 537 (11th Cir.1990); *Threaf Properties Ltd. v. Title Ins. Co.*, 875 F.2d 831, 835–36 (11th Cir.1989)). A pleading well-grounded in fact requires some reasonable basis in fact and is not well grounded in fact if it is contradicted

by uncontroverted evidence that was or should have been known by the attorney signing the document. *In re McNichols*, 258 B.R. at 901 (citing *Home Savs. Ass'n v. Woodstock Assocs. I, Inc. (In re Woodstock Assocs. I, Inc.)*, 121 B.R. 238, 242 (Bankr.N.D.Ill.1990)).

■ In this instance, the statement seems to be factually accurate; that is, the Debtor Tommy Robinson probably did inform Lewellen that the wildlife easement had never been disclosed to Robinson or reviewed by any court. The Court understands the Response to mean that Robinson made this assertion to Lewellen to induce Lewellen to file the complaint in the Circuit Court. The Court does not find that the Response espouses Robinson's false assertion at the later point in time when Campbell and Lewellen filed the Response. For this reason, the Court finds that this statement in the Response, while incorporating the Debtor Tommy Robinson's false statement, is not knowingly false.

## WHETHER THE MOTION, BRIEF, AND RESPONSE WERE FILED FOR AN IMPROPER PURPOSE

■ The improper purpose clause of Rule 9011(b) addresses the filing of a paper for an improper motive such as to harass or to cause delay or needless litigation expense. Under the improper purpose clause, courts rely on "objectively ascertainable circumstances" to support an inference of improper purpose. *In re Am. Telecom*, 319 B.R. at 872 (quoting *In re Collins*, 250 B.R. 645, 662, 664 (Bankr. N.D.Ill.2000) and citing *Beeman v. Fiester*, 852 F.2d 206, 209 (7th Cir.1988), *overruled on other grounds*, *Mars Steel*, 880 F.2d 928). An improper purpose may be inferred from the consequences of the filing, "such as delaying the proceedings or creating 'a persistent pattern of clearly abusive litigation.'" *In re CK Liquidation Corp.*, 321 B.R. at 365 (citing *Bay State Towing Co. v. Barge Am. 21*, 899 F.2d 129 (1st Cir.1990); *Aetna Life Ins. Co. v. Alla Med. Servs., Inc.*, 855 F.2d 1470, 1476 (9th Cir. 1988)).

■ In the instant case, the Movants allege that the Motion, Brief and Response were filed to harass, delay, and needlessly increase the cost of litigation. At the TRO hearing, the Circuit Court made it clear that it would not proceed on the merits of the case until permitted to do so by order of the bankruptcy court. Thus, the obvious purpose of the Motion and Brief was to facilitate the purpose of the state court complaint, a copy of which was attached to the Motion when filed. Therefore, if the state court action was filed for an improper purpose, then furthering that purpose with the Motion and Brief is sanctionable under Rule 9011.

Consequences of the state court action were that the auction was cancelled for lack of title insurance because two conditions were not met: the state court action was not dismissed with prejudice and the notice of lis pendens filed by Lewellen was not released. As a result of the cancellation, the Movants forfeited the $110,000.00 advanced to advertise and sell the property.

Despite Lewellen's testimony that he verbally released the notice of lis pendens during the TRO hearing on December 19, 2007, the Monroe County Circuit Clerk records reveal the lis pendens was withdrawn by facsimile transmission to the clerk's office on January 2, 2007 and released of record January 5, 2007. Lewellen knew or should have known that while the lis pendens remained of record, the auction would be halted, if for no other reason than that there would be no bidders on a piece of property where title was at issue. *See* Ark.Code Ann. § 16–59–101

(Michie 1987 & Supp.2005) (filing of a lis pendens against property renders a pending complaint affecting title a matter of record before the complaint is reduced to judgment).

Moreover, the complaint in the state court action was not dismissed by Lewellen until February 27, 2007, and was dismissed only so that Lewellen and Robinson could purge themselves of the Court's finding of civil contempt and be released from jail. Thus, because title insurance could not be procured by the sellers, the complaint, like the lis pendens, severed any chance that the auction could proceed at the appointed time.

As a result of the lis pendens and the pending lawsuit filed only one day before the scheduled sale, the auction was cancelled and the sellers lost $110,000.00. The timing of the filing of the state court action one day before the auction supports the inference that the plaintiffs' purpose was to stop the sale at a time that was most inconvenient and expensive to their adversaries. Even if Lewellen was unaware of the magnitude of the auction expense, he must have known how frustrating this delaying tactic would be to the Movants.

Another consequence, as Rothwell pointed out at the sanctions hearing, has been the adverse publicity surrounding the failure to complete the auction process because of the pending litigation. Additionally, the Debtor Tommy Robinson has appealed this Court's order denying relief from stay to pursue the state court action and the Court's order of contempt requiring the state court action to be dismissed with prejudice. The combination of the adverse publicity and pending appeals will likely quell any buyer interest in the foreseeable future. Meanwhile, the current owners of Wildlife Farms must continue to service the debt on the property and fund operating deficits out of their own pockets.

From these consequences, the Court infers the Motion for Relief from Stay and Brief in support were filed by Campbell and Lewellen for improper purposes in violation of Rule 9011. The Motion and Brief further the state court action's improper purposes of indefinitely delaying the sale of the property, harassing the Movants, and causing them to incur enormous and unnecessary expenses associated with the cancellation of the auction and the ongoing costs of the Wildlife Farms operation.

### THE PROPER SANCTION

■ In deciding upon a proper sanction under Rule 9011, courts may consider various factors, including whether good intentions prompted the filing of the offending paper. *In re Phillips*, 433 F.3d 1068, 1071–72 (8th Cir.2006). Other factors to consider include the expenses incurred by the movant; Rule 9011's multiple purposes of deterrence, compensation, and punishment; the severity of the violation; the movant's contribution to any resulting delay; legal experience and history of the nonmovant's attorney; and ability to pay, if raised by the nonmovant. *In re Am. Telecom*, 319 at 873 (citing *In re King*, 83 B.R. 843, 848 (Bankr.M.D.Ga.1988); *In re Addon Corp.*, 231 B.R. 385, 391 (Bankr. N.D.Ga.1999); Georgene M. Vairo, *Rule 11 Sanctions: Case Law, Perspectives and Preventive Measures* 566, 530–31, 556–57, 704, 707, 710 (Richard G. Johnson ed., 3d ed.2004)).

■ Courts have held that attorneys fees and costs can be awarded as a Rule 9011 sanction to deter future misconduct and redress any injury caused by the misconduct. *See, e.g., Schwartz v. Kujawa (In re Kujawa)*, 270 F.3d 578, 583 (8th Cir.2001) (affirming award of attorneys fee

in the amount of $66,656.33 for violating Rule 9011); *In re Clark*, 223 F.3d 859, 864 (8th Cir.2000)(stating bankruptcy court has jurisdiction under Rule 9011 to assess attorneys fees as sanctions) (citing *Brown v. Mitchell (In re Arkansas Communities)*, 827 F.2d 1219, 1222 (8th Cir.1987)). Generally, an award of attorney's fees and expenses is limited to legal costs directly caused by the offending paper. *In re Am. Telecom Corp.*, 319 B.R. at 874.

■ Without reservation, the Court concludes that Lewellen and Campbell deserve to be sanctioned for preparing the Motion and Brief in violation of both the frivolous and improper purpose clauses of Rule 9011. In this case, the Court's first duty is to deter Lewellen and Campbell from fabricating legal principles; posing baseless legal arguments; misstating or omitting the relevant facts; conveniently ignoring the real issues in the case, especially when those issues are simple and clear-cut; and filing papers for improper purposes.

At the same time, the sanction should in some way compensate the Movants, who have been greatly harmed. The Motion for Relief from Stay and Brief in support have furthered the improper purposes of causing delay, harassment, and unnecessary expense and will doubtless continue to cost the Movants untold monetary damage before the appeals process runs its course. Campbell and Lewellen should not be permitted to escape financially unscathed when their actions have wreaked such monetary havoc on the Movants in this case.

At the foundation of Chapter 7 is the trustee's power to administer property of the estate. At the heart of the legal process is the res judicata effect of an unappealed, final order. Yet by their actions, Campbell and Lewellen have singlehandedly attacked both principles. They have destroyed the settlement agreement between the Trustee and the Movants and launched an illegitimate collateral attack upon this Court's unappealed final order approving the settlement. Both Campbell and Lewellen, as experienced practicing attorneys, should know better than to engage in such tactics. They must be held accountable for their very serious abuse of the bankruptcy process. The nature of their conduct refutes any argument on their part that their actions were well intentioned and taken in good faith.

For all these reasons, the Court finds that sanctions against Campbell and Lewellen will include being required to pay the Movants' legal fees and costs incurred in the course of defending the Motion for Relief from Stay and Brief in Support and for prosecuting the First Motion for Sanctions. To the extent that the Debtor Tommy Robinson has been previously ordered to pay these legal fees and costs, Campbell and Lewellen will be jointly and severally liable with the Debtor Tommy Robinson for these fees

■ At the April 20, 2007 Sanctions hearing, the Court assessed Lewellen for the Movants' damages in the amount of $110,000.00. Upon further reflection, the Court recognizes that to assess Lewellen for that amount would be to sanction him for filing the state court action, which the Movants have not requested in their Motion for Sanctions. Moreover, the Rule does not expressly permit the Court to sanction attorneys based on their filings in other jurisdictions.

Therefore, the Court holds Campbell and Lewellen jointly and severally liable for the payment of $10,000.00 to Thompson and for payment of $10,000.00 to Rothwell to partially compensate the Movants for the ongoing monetary injury of having to defray the deficit generated by Wildlife

Farms until the property sells. The Court believes this deficit is directly caused by the filing of the Motion for Relief from Stay, which perpetuated the state court action and continues to discourage buyers. This monetary sanction serves the twin purposes of deterring Campbell and Lewellen from filing future frivolous and improper motions with the Court and of partially compensating the Movants for the harm Campbell and Lewellen have inflicted on them through the offending papers.

## SECOND MOTION FOR SANCTIONS AGAINST CAMPBELL

■ The Movants' Second Motion for Sanctions ("Second Motion") against Campbell has its genesis in false allegations made in the Counterclaim Campbell filed on the Debtors' behalf when the Debtors were named as defendants in the Objection to Discharge litigation, adversary proceeding 2:06–ap–0111, that has since been concluded.

As previously stated, on March 23, 2006, the Movants filed an Objection to Discharge against the Debtors. On behalf of the Debtors, Campbell filed an answer and a Counterclaim for fraud against the Movants on April 14, 2006.

The basis of the Counterclaim was the alleged fraudulent concealment of the wildlife easement. In the course of pleading the Counterclaim, Campbell stated in Paragraph 3 that the Plaintiffs (Movants) had testified on September 28, 2005, at the Involuntary Hearing before the Bankruptcy Court that the Debtors' interest in Wildlife Farms had no value.

The Counterclaim further asserted in Paragraph 7 that the Plaintiffs (Movants) had committed perjury in the September 28, 2005 Involuntary Hearing before the Bankruptcy Court. The perjury consisted of a statement or statements by Rothwell and/or Thompson that they were unaware

either that Wildlife Farms' real property had been placed in the Wetland Reserve Program or that Wildlife Farms "had a contract for it to be placed in such a program. . . ." (Pls.' Ex. 1, Cred.'s Ex. 2, Bankruptcy Counterclaim for Fraud.) The Counterclaim alleged that these statements were made for the purpose of defrauding the Debtors of their share of the proceeds from sale of the wildlife easement. (Pls.' Ex. 1, Cred.'s Ex. 2.)

By letter dated May 16, 2006, and transmitted by facsimile, the Movants' counsel wrote Campbell to notify her informally of the Movants' intent to serve her with a motion for sanctions against her unless she deleted Paragraphs 3 and 7 within the next five days. (Pls.' Ex. 5, Ex. A—Ex. A, "Warning Letter.") In the Warning Letter, counsel for the Movants stated that he had reviewed the transcript of the Involuntary Hearing and had then concluded that the allegations in Paragraphs 3 and 7 were baseless, reckless, and irresponsible. (Pls.' Ex. 5, Ex. A–Ex. A, Warning Letter.) Counsel offered to permit Campbell to review the transcript of the September 28, 2005 Involuntary Hearing, which the Movants had purchased at a cost of $500.20, or to purchase a copy of the transcript herself for a charge of $72.00. (Pls.' Ex. 5, Ex. A–Ex. A.) Apparently, Campbell never responded to this letter.

Seven days later, Counsel for Movants served Campbell, by certified mail, with a copy of an unfiled Motion for Sanctions and a letter providing her with the twenty-one day safe harbor, pursuant to Rule 9011, in which to correct the offending allegations and avoid the filing of the Motion. (Pls.' Ex 5, Ex. A–Ex. B.) Campbell did not delete the offending paragraphs, and the Motion was filed on July 14, 2006. Attached to the Motion were several exhibits, including that portion of the Involuntary Hearing transcript that included

the testimony of Rothwell and Thompson. The Motion for Sanctions charged that the allegations in Paragraphs 3 and 7 of the Counterclaim were without factual basis and asked for monetary sanctions consisting of attorneys fees, costs, and a sum sufficient to deter Campbell from such conduct in the future. (Pls.' Ex. 5, Ex. A.)

The Motion was scheduled for a hearing, but prior to that time, Counsel for the Movants and Campbell settled the issues raised by the Motion. Campbell signed a stipulation ("Stipulation") dated August 22, 2006, that she agreed to dismiss her Counterclaim with prejudice and that she and her clients were mistaken about the facts in Paragraphs 3 and 7 of the Counterclaim. (Pls.' Ex. 5, Ex. B.) The Stipulation was filed with the Court. Subsequently, an agreed order dismissing the Counterclaim with prejudice was entered, and the Motion was withdrawn.

Some months later, Lewellen filed the state court action on behalf of the Debtors in the Circuit Court, which led to the filing by the Movants of the Motion for Contempt against Lewellen and the Debtors. At the hearing on the Motion for Contempt on February 26, 2007, the Debtor Tommy Robinson testified in direct testimony elicited by Campbell, that "[if] anybody ought to be referred for criminal contempt and criminal perjury, it ought to be Boyd Rothwell and Bill Thompson. They both lied in this Court about the 1.7 million dollars, and made no bones about it." (Pls.' Ex. 1, Tr. at 160.) He stated his interest in Wildlife Farms was worth millions of dollars and that the Movants "obtained this one-third by an act of fraud. And then perjured themselves about it in this courtroom." (Pls.' Ex. 1, Tr. at 163.)

On cross examination, counsel for the Movants asked the Debtor Tommy Robinson if the perjury he referred to was the same perjury referred to in Paragraphs 3 and 7 of the Counterclaim later dismissed with prejudice. (Pls.' Ex. 1, Tr. at 167–71.) Robinson agreed that it was. (Pls.' Ex. 1, Tr. at 171.) When shown the Stipulation filed by Campbell that withdrew the offending allegations, Robinson said he could explain. He testified, "[y]ou had threatened sanctions against my attorney, Sheila Campbell, and she did not have the transcript. You had told her that they had not committed perjury. I had to pay nine hundred and something dollars after the fact to get the transcript that she introduced today, that they did commit perjury. She couldn't remember." (Pls.' Ex. 1, Tr. at 171.)

The following exchange between Robinson and counsel for Movants then transpired:

Q. Did Ms. Campbell tell you that I had the transcript at my office and invited her to come read it?

A. She did not.

Q. Were you aware of the fact that Ms. Campbell never made any effort to avail herself of the transcript that my clients purchased for 750 dollars from the Bankruptcy Court?

A. She did not tell me that. I hope you read it when you knew your own clients committed perjury.

Q. So why—you're saying that she did this out of ignorance, she signed this paragraph one, stipulations, because she didn't know what she was stipulating was true or not?

A. I think you threatened her with sanctions and she couldn't remember what the testimony was. And you used that as a hammer when you knew that they had committed perjury . . .

Pls.' Ex. 1, Tr. at 171–72.

After Robinson testified, Campbell then addressed the Court with the following explanation:

Your Honor, Mr. Hankins has stated to the Court that he invited me to his office to read the transcript. And I want to state, as an Officer of the Court, he did not invite me to his office. He threatened me with sanctions. I did not have the transcript. I did not have the money to buy the transcript. So I told Mr. Robinson that I needed to withdraw this because I could not afford to get any sanctions against me.

Pls.' Ex. 1, Tr. at 181.

Following the statements of Robinson and Campbell at the February 26, 2007 Contempt Hearing, the Movants mailed Campbell a copy of a proposed Motion for Sanctions and provided her with a 21–day safe harbor in which to retract the false statements made in open court and avoid the filing of the Motion. When Campbell failed to retract any statement within the safe harbor period, the Movants filed the Second Motion for Sanctions on April 4, 2007. Campbell subsequently filed a Response to the Second Motion and a Brief in Support on April 6, 2007. The Court conducted a hearing on the Second Motion on April 20, 2007, at which Campbell appeared and testified.

After considering Campbell's response and testimony and the other evidence submitted in support of the Second Motion, the Court concludes that the Warning Letter to Campbell and the original Motion introduced into evidence at the Sanctions Hearing demonstrate beyond any doubt that Campbell's later statement before this Court at the Contempt Hearing was blatantly false. In their Warning Letter to her, Counsel for the Movants offered to let Campbell read their copy of the Involuntary Hearing transcript at no cost to her or her clients. For some reason not revealed by the record, she ignored the offer and then denied, before this Court, that such an offer had ever been made.

Moreover, the original Motion for Sanctions, later withdrawn, attached a portion of the Involuntary Hearing transcript that included the testimony of Rothwell and Thompson. The transcript reveals that the Debtor Tommy Robinson testified incorrectly at the Contempt Hearing that Campbell was bullied into signing the Stipulations because "she couldn't remember what the testimony was." (Pls.' Ex. 1, Tr. at 172.) Campbell did not have to remember the testimony because it was provided to her in transcript form by the Movants. Campbell's statement that she withdrew the Counterclaim because "I did not have the transcript" was also false and misleading. (Pls.' Ex. 1, Tr. at 181.) Campbell did have access to the relevant portions of the Involuntary Hearing transcript by virtue of the original Sanctions Motion that attached the relevant portions of the transcript.

In her Brief in Response to the Second Motion for Sanctions, Campbell stated that the Court had ruled that she did not have standing to bring the Counterclaim in the Objection to Discharge litigation. From that ruling, Campbell determined that the Counterclaim and all its contents had no legal effect. Therefore, Campbell's repudiation in open court of her previous Stipulation that the plaintiffs had not given false testimony was permissible. In testimony, she reiterated this position. Campbell cites no authority for this legal theory.

Campbell's Response to the Second Motion for Sanctions does not address her false statements before this Court. She makes no excuse whatsoever for her gross misstatement of the facts in vehemently denying "as an officer of the court" that opposing counsel had offered to allow her to read the transcript. Nor does she simply admit to being mistaken about the facts and apologize. She leaves the Court to speculate about why she made false

statements in open court and why she failed to act on the Warning Letter and accept the Movants' offer to let her read their copy of the transcript. Had she done so, she would have saved herself embarrassment and the Movants expensive legal fees.

At the very least, Campbell has violated the Rules of Professional Conduct in her lack of candor toward the tribunal that would include eliciting false testimony of the Debtor Tommy Robinson that contradicted the stipulations she previously signed and filed with this Court. *See* Arkansas Rule of Professional Conduct 3.3(a)(1) & (3)("A lawyer may not knowingly ... make a false statement of fact or law to a tribunal; or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; ... or ... offer evidence that the lawyer knows to be false....") She has breached her agreement with Movants' counsel that she would retract the offending statements in exchange for dismissing the original Sanctions motion. Counsel for Movants kept his part of the bargain; Campbell did not.

Campbell's conduct is also sanctionable under Rule 9011 in that she has continued to advocate her original position expressed in the Counterclaim that at the September 28, 2005 Involuntary hearing, Thompson and Rothwell committed perjury with regard to testimony about the wildlife easement. In her Response to the Second Motion for Sanctions, Campbell attached a copy of her cross examination of Rothwell at the Contempt Hearing on February 26, 2007. During that cross examination, Campbell attempted to show that Rothwell had lied about the wildlife easement at the Involuntary Hearing on September 28, 2005. At the contempt hearing, she requested Rothwell to read portions of his testimony from the Involuntary Hearing

transcript. She focused on a portion of the direct examination of Rothwell by his attorney after the Debtor had testified:

BY MS. CAMPBELL;

Q. Let me show you this [transcript of the Involuntary Hearing]. You were being questioned by your attorney, Mr. Hicks, and he said:

"Q. Listening to Mr. Robinson's testimony this morning, as I know you have, and Mr. Robinson has indicated that you've given false testimony about matters relating to this case, can you tell me whether or not that's correct?"

And what was your answer?

"A. That is not correct."

(Response to Motion for Sanctions, April 6, 2007, Ex. 1 at 83.)

Although she does not directly assert this argument, Campbell implies in her Response to the Second Motion for Sanctions that Rothwell's response, "That is not correct," was false testimony with regard to the existence of the wildlife easement option. However, upon examination of the transcript of the Involuntary Hearing, (Ex. C–3.), the Court finds that Rothwell's response merely refuted the Debtor's previous testimony that Rothwell had lied, misled, or testified falsely in the past during the course of litigation between the parties.

Indeed, the Debtor did testify repeatedly at the Involuntary Hearing that Rothwell and Thompson lied and made false and misleading statements in various contexts, but none of these allegations were even remotely related to charges of falsely testifying about the wildlife easement option. The Debtor's allegations centered on the *pro forma* that induced the Debtor Tommy Robinson to become a partner in Wildlife Farms, allegedly perjured testimony in the Monroe County foreclosure

proceeding, and false statements regarding loans and other obligations of the Debtor. (*See* Ex. C–3 at 37–44, 52,–53, 55, 57.)

The Court has carefully studied the transcript of the Involuntary Hearing and has found only one reference to the wildlife easement option, a statement made by the Debtor, not by Thompson or Rothwell. The Debtor testified, "I know they've just recently, or they started some months ago, they've now put it in the Wildlife Preserve Program planting trees and that's probably another million dollars that they have." (Ex. C–3 at 51.) The Debtor went on to assert that "I fully believe the reason they kicked us out [of Wildlife Farms limited liability company], they knew what they were doing, because I've talked to the people at the NRCS office. This has been coming on for some time. So, if they've got a million dollars and they started that process before they bought me out or bought our share in January of 2005, we're entitled to a third of what they have received from the government." (Ex. C–3 at 52.)

With these remarks, the Debtor does not accuse Rothwell and/or Thompson of testifying falsely as to the wildlife easement option, but instead expresses the opinion that he is entitled to share in the proceeds from the sale of the easement. The Debtor's accusations of false testimony at the Involuntary Hearing related to matters other than the wildlife easement; therefore, Rothwell's later denial at the same hearing of the Debtor's charges of perjury did not pertain to the Debtor's statements about the wildlife easement.

Moreover, Campbell's original allegation was that Rothwell and Thompson perjured themselves by stating at the Involuntary Hearing that they were unaware either that Wildlife Farms' real property had been placed in the Wetland Reserve Program or that Wildlife Farms had an option to sell the easement. (Pls.' Ex. 1, Cred.'s Ex. 2.) The testimony of Rothwell and Thompson contains not one single reference to the wildlife easement, as any competent attorney could easily determine after a perusal of the transcript of the Involuntary Hearing.

Campbell violated Rule 9011 by failing to conduct a reasonable investigation of her suspicions with regard to her allegations of perjury, even when opposing counsel pointed out her error and offered to make the task easy for her by providing the transcript. The allegations of perjury lack any evidentiary support and are, in fact, contradicted by uncontroverted evidence in the Involuntary Hearing transcript that neither Rothwell nor Thompson referred to the wildlife easement at all. Campbell's persistence with regard to these unfounded allegations demonstrates a deliberate indifference to obvious facts. That she repudiated a signed stipulation filed as part of a settlement of the original Motion for Sanctions compounds the egregious nature of her conduct.

To deter Campbell from filing frivolous pleadings without factual support, the Court orders her to pay the Movants' attorneys fees and expenses generated in response to her Counterclaim, including but not limited to fees related to the Warning Letter, original Motion for Sanctions, settlement negotiations of the original Motion, Second Motion for Sanctions, and the hearing on the Second Motion for Sanctions.

Further, Campbell is ordered to pay $2,000.00 to Rothwell and $2,000 to Thompson to deter Campbell from making baseless allegations and to partially compensate Rothwell and Thompson for the insult of having been falsely accused of perjury. The Court concludes these sums will also serve as sufficient deterrent if

Campbell is ever again tempted to breach a settlement agreement.

## CONCLUSION

For the reasons stated, the Court grants the two Motions for Sanctions. Campbell and Lewellen are hereby ordered to pay monetary sanctions pursuant to Federal Rule of Bankruptcy Procedure 9011. Counsel for the Movants shall file within twenty days of the entry of this Order a statement for attorneys fees and costs as awarded by this Order. A copy of this Order will be forwarded to the Supreme Court Committee on Professional Conduct for investigation of possible violations of the Arkansas Rules of Professional Conduct by Campbell and Lewellen.

IT IS SO ORDERED.